## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**VOLVO POWERTRAIN<br>CORPORATION,**<br><br>**Defendant.** |

**Civil Action 98-2547  (RCL)**

### MEMORANDUM OPINION

This dispute concerns a consent decree to which the United States and Volvo Powertrain Corporation are parties.  Volvo Powertrain has assumed the obligations of Volvo Truck Corporation, the original signatory to the decree.  The California Air Resources Board, which signed a substantially identical settlement agreement with Volvo Truck, has intervened.  Before the Court is Volvo Powertrain's motion for judicial review of the demand by the United States for stipulated penalties pursuant to the decree.  Powertrain asks the Court to find either that it has not violated the decree or else that the stipulated penalties established therein do not apply. Upon consideration of the motion, the oppositions thereto, and the record of this case, the Court concludes that Volvo Powertrain's motion must be denied in part, because the company violated the consent decree.  Because the stipulated penalties do not clearly apply to this violation, the Court goes on to exercise its equitable authority and discretion to fashion a remedy.  Finally, the Court turns to the essentially identical dispute between Volvo Powertrain and the California Air Resources Board regarding the effect of their settlement agreement.

# I.  FACTUAL BACKGROUND

In 1998, the United States brought enforcement actions against many manufacturers of truck engines, alleging that a feature of their fuel injection systems violated the Clean Air Act. Those fuel injection systems were operated by computer software, which the government alleged had been programmed to operate differently at highway speeds than under the standardized conditions of federal emissions testing, thereby improving the fuel economy of the engines but causing them to emit nitrogen oxide at levels well above the legal limit.  The government argued that the "principal effect" of such a fuel injection timing system was "to bypass, defeat, or render inoperative" the engines' emissions control system, in violation of 42 U.S.C. § 7522(a)(3)(B), and that the timing system was therefore a prohibited "defeat device," 40 C.F.R. § 86.000-16(a). The manufacturers denied that their systems were prohibited.

After a year of negotiations, including a session at which counsel for the engine manufacturers collectively negotiated settlement terms with the United States, the parties agreed to be bound by a series of similar consent decrees.  (The decrees' similarity ensured that no manufacturer would gain a competitive advantage by negotiating superior settlement terms.) Under these decrees, the engine manufacturers were required to meet new emissions standards for heavy-duty diesel engines, which are used in trucks and other on-road vehicles, before those standards took general effect.  The manufacturers also agreed to accelerate the implementation of heightened emissions standards for non-road compression-ignition engines with a horsepower of at least 300 but less than 750.  (The parties refer to this term as the "non-road pull-ahead," and the Court will call the engines to which it applies "non-road engines.")  Non-road engines had

not been a part of the alleged violation, but were included in the consent decrees in an attempt to further reduce the levels of ambient air pollutants.

After a period of public comment, the Honorable Henry H. Kennedy, Jr. found that the decrees would serve the public interest.  He entered them on July 1, 1999.  This case concerns one such decree.

The consent decree in question was initially signed by Volvo Truck Corporation, which did not sell non-road engines.  Volvo Construction Equipment, which did, intervened shortly before the decree was entered so as to be bound by the non-road pull-ahead.  In 2001, as part of a corporate reorganization, Volvo Powertrain acquired certain production facilities from Volvo Truck and assumed Volvo Truck's responsibilities under the consent decree.  Thereafter, Volvo Powertrain used its manufacturing facility in Skövde, Sweden to produce non-road engines for Volvo Penta, a corporate sibling, as Volvo Truck had done when it owned the Skövde plant.  In late 2004, Volvo Penta asked the US EPA to certify that eleven families of engines produced by Volvo Powertrain at the Skövde facility conformed with the emissions standards for non-road engines produced in Model Year 2005.  The EPA issued the certificates of conformity.  After a competing engine manufacturer suggested to the United States that, under the consent decree, those engines might have been required to conform to the more stringent standards for Model Year 2006, the United States submitted a series of information requests to Volvo Powertrain.  In July 2008, the government issued a letter alleging that the company had violated the decree and demanding penalties of approximately $72 million under its stipulated penalty provisions.  Volvo Powertrain denied the allegations and, after the parties attempted to resolve the dispute as required by the consent decree, petitioned this Court for review.

3

## II.  JURISDICTION AND LEGAL STANDARD

"[D]istrict courts enjoy no free-ranging . . . jurisdiction to enforce consent decrees, but are instead constrained by the terms of the decree and related order." *Pigford v. Veneman*, 292 F.3d 918, 924 (D.C. Cir. 2002) (citing *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 380–81 (1994)).  When the District Court entered the consent decree at issue here, it retained jurisdiction "for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary . . . to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with the dispute resolution procedures" described by the decree.  Consent Decree ¶ 151.  The parties have followed those procedures, *see id.* ¶¶ 129–36, and this Court has jurisdiction over Volvo Powertrain's motion for judicial review of their dispute.

"[C]onstruction of a consent decree is essentially a matter of contract law." *Segar v. Mukasey*, 508 F.3d 16, 21 (D.C. Cir. 2007) (quoting *Citizens for a Better Environment v. Gorsuch*, 718 F.2d 1117, 1125 (D.C. Cir. 1983)).[1]  "The court's task, then, is to discern the bargain that the parties struck." *United States v. Microsoft Corp.*, 147 F.3d 935, 946 (D.C. Cir 1998).  "Our inquiry begins, of course, with the text of the Decree." *United States v. Western*

---

[1] A federal court interpreting its own consent decree applies the federal common law of contracts.  *See In re Harvey*, 213 F.3d 318, 321 (7th Cir. 2000); *United States v. Witco Corp.*, 76 F. Supp. 2d 519, 530 (D. Del. 1999); *cf. KenAmerican Resources, Inc. v. International Union, United Mine Workers of America*, 99 F.3d 1161, 1164 n.2 (D.C. Cir. 1996) ("A federal court interpreting a collective bargaining agreement applies [the] federal common law of contracts.").  The Restatement (Second) of Contracts is an appropriate source from which to fashion such federal common law rules, *Bowden v. United States*, 106 F.3d 433, 439 (D.C. Cir. 1997), but where the principles of contract law in question are "unexceptional" and "urged in the briefs of both parties," the Court may look to other sources.  *Segar v. Mukasey*, 508 F.3d 16, 21 n.3 (D.C. Cir. 2007).

*Elec. Co.*, 12 F.3d 225, 230 (D.C. Cir. 1993).  If the text is unambiguous, the inquiry ends there, because "a court may not look to extrinsic evidence of the parties' subjective intent unless the document itself is ambiguous." *Segar*, 508 F.3d at 22.  In determining whether the document is, in fact, ambiguous, "reliance upon certain aids to construction is proper, as with any other contract.  Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree." *United States v. I.T.T. Continental Baking Co.*, 420 U.S. 223, 238 (1975).  However, "a contract provision 'is not ambiguous merely because the parties later disagree on its meaning.'  It is ambiguous only 'if it is reasonably susceptible of different constructions.'" *Segar*, 508 F.3d at 22 (quoting *Bennett Enterprises, Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995)).

### III.  THE CONSENT DECREE

To resolve this dispute, the Court must answer three questions.  The first is whether the consent decree covers engines produced by Volvo Powertrain but submitted for certification by Volvo Penta, which is not a party to the decree.  It does.  All non-road engines built at a Powertrain facility and submitted for certification by the EPA are covered by Paragraph 110 of the consent decree and required to conform to the non-road pull-ahead.  The second question is whether, under the consent decree, a non-road engine is defined by its certification or by its actual use.  Because a definition grounded in actual use would make the consent decree practically impossible to enforce, the Court concludes that any engine labeled for use as a non-road engine is a non-road engine within the meaning of the decree.  Third, the court must determine whether the stipulated penalties established in the decree apply to the violations at

issue here.  Because the engines in question were submitted for certification by Volvo Penta rather than Volvo Powertrain, the stipulated penalties do not clearly apply and the Court must fashion an equitable remedy instead.

**A.    Volvo Powertrain violated Paragraph 110 of the consent decree.**

Although the Court is mindful that a consent decree, like a contract, should be read as a whole and each part interpreted with reference to the whole, three provisions of the decree are especially relevant here.  Paragraph 60 requires that all non-road engines "manufactured by" Volvo Powertrain[2] on or after January 1, 2005 must meet certain emissions standards as well as "all other requirements that would apply as if the engines were Model Year 2006 engines." Paragraphs 109 and 110 appear below the header "Non-Circumvention Provisions."  Paragraph 109 says that Volvo Powertrain "shall not . . . circumvent the requirements of this Consent Decree through leasing, licensing, sales, or other arrangements, or through stockpiling." Paragraph 110 requires that all non-road engines "manufactured at any facility owned or operated by [Volvo Powertrain] on or after January 1, 1998, for which a Certificate of Conformity is sought, must meet all applicable requirements of this Decree, regardless of whether [Volvo Powertrain] still owned, owns, operated, or operates that facility at the time the engine is manufactured."

The United States argues that, under each of these provisions, non-road engines built by Volvo Powertrain after January 1, 2005 were required to meet the emissions standards for Model Year 2006.  Volvo Powertrain maintains that they were not.  The company contends that under

---

[2] Volvo Powertrain has assumed these obligations as the successor to Volvo Truck Corporation.  Consent Decree ¶ 4.

Paragraph 60 engines are "manufactured by" the entity that orders them and submits them for certification, and that in any event the United States has waived its argument as to the direct applicability of that provision to this case. Volvo Powertrain denies that it has circumvented the requirements of the consent decree, as Paragraph 109 forbids, and urges the Court to limit the scope of Paragraph 110 to engines that would have been required to meet the non-road pull-ahead set out by Paragraph 60 but for the transfer of manufacturing facilities from Volvo Powertrain to another owner. The Court concludes, however, that Paragraph 110 means what it says: all non-road engines manufactured at Volvo Powertrain facilities and submitted for certification by the EPA must meet the requirements of the consent decree. The Court need not address the government's arguments that Paragraphs 60 and 109 also compel that result.

Volvo Powertrain begins its interpretation of Paragraph 110 with the header that appears above it: "Non-Circumvention Provisions." The company argues that such provisions are administrative in nature and should not be interpreted to expand the scope of decree's substantive provisions. Powertrain reasons that one can only violate a non-circumvention provision by evading otherwise-applicable requirements, which brings the company to the text of Paragraph 110:

> All . . . Nonroad CI Engines manufactured at any facility owned or operated by [Volvo Powertrain] on or after January 1, 1998, for which a Certificate of Conformity is sought, must meet all applicable requirements of this Decree, regardless of whether [Volvo Powertrain] still owned, owns, operated, or operates that facility at the time the engine is manufactured.

Powertrain contends that the phrase "all applicable requirements of this Decree" must mean "the requirements that are made applicable by a provision other than Paragraph 110." It also places a great deal of emphasis on the final clause, "regardless of whether [Volvo Powertrain] still

owned, owns, operated, or operates that facility at the time the engine is manufactured," suggesting that this language identifies the purpose and the function of the provision: to prevent the evasion of substantive obligations through the transfer of manufacturing operations or facilities.  On Volvo Powertrain's reading, Paragraph 110 prohibits only such acts of evasion. The company further points to the stipulated penalties provision, which on its face applies only when Volvo Powertrain—and not any other entity—seeks certificates of conformity.  The company argues that to read Paragraph 110 to allow the possibility that the decree could be violated when some other company sought a certificate of conformity would render that paragraph inconsistent with the penalty provision.  Finally, Powertrain argues that the government's reading of Paragraph 110 would have made the intervention of Volvo Construction Equipment in this case superfluous, since all of that company's engines were produced at Volvo Truck facilities when the consent decree was negotiated.

> **i.     The plain language of Paragraph 110 covers all non-road engines manufactured at Volvo Powertrain facilities**.

The plain text of Paragraph 110 clearly supports the government's argument.  The provision applies to all non-road engines "manufactured at" a facility owned or operated by Volvo Powertrain at any time since the beginning of 1998 "for which a Certificate of Conformity is sought," "regardless of" who controls that facility at the time of manufacture.  Powertrain argues that giving an ordinary reading to the "regardless of" phrase would deprive the clause of independent meaning, because the reference to all non-road engines "manufactured at any facility owned or operated by [Volvo Powertrain] on or after January 1, 1998" necessarily implies a lack of regard for the ownership of the facility at the time of manufacture.  Although the Court must interpret the consent decree so as to avoid surplusage, it should not strain normal

syntax in its effort to do so—and contracts, like normal speech, often employ a certain redundancy in the interest of clarity.  The court therefore rejects the argument that it must interpret "regardless of whether [Volvo Powertrain] still owned, owns, operated, or operates that facility at the time the engine is manufactured" to limit the scope of Paragraph 110.  The "regardless of" clause is plainly meant to emphasize the breadth of the "all non-road engines" clause, not to limit it—and the Court construes the provision accordingly.

Paragraph 110 requires that the engines to which it pertains "must meet all applicable requirements of this Decree."  Volvo Powertrain contends that the "applicable requirements" must be those that are rendered applicable by some other provision of the decree, rather than by Paragraph 110 itself.  This argument has some force if one considers the language in isolation, but loses that force when the language is considered in the context of the provision and the decree as a whole.  Both parties agree that if Volvo Powertrain had sold its factories and its engine business, Paragraph 110 would ensure that the purchaser was subject to the requirements of the consent decree for the non-road engines that it produced in facilities acquired from Powertrain.  In that hypothetical case, it is obvious that the requirements applicable to those non-road engines would include the ones set out by Paragraph 60—and it would be Paragraph 110 that made those requirements "applicable," since Paragraph 60 only covers engines "manufactured by" Volvo Powertrain or Volvo Construction Equipment.  And so it cannot be the case that the "applicable requirements of this Decree" are only those that another provision makes applicable.  At least in some cases—and, a sensible reading would suggest, in this case—that language refers to substantive requirements that are set out in another provision but rendered applicable to certain engines by Paragraph 110.

9

### ii.   The plain language of Paragraph 110 does not conflict with the header identifying it as a non-circumvention provision.

Of course, the plain language of Paragraph 110 cannot be considered alone.  Volvo Powertrain rightly urges the Court to interpret that paragraph in light of the header that identifies it as a "non-circumvention provision."  It would, Powertrain argues, render the header meaningless to find that Paragraph 110 covered circumstances in which the company did not attempt to circumvent the consent decree.  If the header conflicted with the text of Paragraph 110 an ambiguity might result, as it did in *International Multifoods Corporation v. Commercial Union Insurance Company*, 309 F.3d 76 (2d Cir. 2002).  That case involved an insurance contract whose "War Exclusion Clause" included a provision the plain language of which appeared to exclude coverage for peacetime seizures.  *Id.* at 80–81.  The covered company lost a shipment of frozen meat when the Russian government seized the goods as part of a criminal investigation, and its insurer argued that such a seizure was excluded from coverage by the second provision of the "War Exclusion Clause."  *Id.* at 80.  The food company responded that, properly understood, the contract only excluded wartime seizures.  Considering the caption "in tandem with" the contractual provisions that it describes, *id.* at 86, the Second Circuit concluded that "competing inferences . . . can be drawn" and that the scope of the provision was therefore ambiguous, *id.* at 87.

But the header "Non-Circumvention Provisions" does not conflict with the text of Paragraph 110, even if it does identify that provision's purpose.  To hold otherwise would ignore the fact that there are many ways to achieve a particular purpose when drafting an agreement.  To use an old dichotomy, one can create a rule or a standard.  Whereas a standard "refers directly to [its] substantive objectives," Duncan Kennedy, *Form and Substance in Private Law*

10

*Adjudication*, 89 HARV. L. REV. 1685, 1688 (1976)—for instance, to prevent the circumvention

of other contractual provisions—a rule simply instructs the person to whom it is addressed to

respond to particular facts in a particular way.  "[T]he two great . . . virtues of . . . rules, as

opposed to standards . . . are the restraint of official arbitrariness and certainty," *id.*, but those

benefits also have a cost because "[t]he choice of rules [over standards] involves the sacrifice of

precision in the achievement of the objectives lying behind the rules."  *Id.* at 1689.

      When Paragraph 109 says that Volvo Powertrain "shall not . . . circumvent the

requirements of this Consent Decree" it is employing the language of standards.  The question of

whether any particular action circumvents the agreement can only be answered by "discover[ing]

the facts of [the] particular situation and . . . assess[ing] them in terms of the purposes . . .

embodied in the" agreement.  *Id.* at 1688.  One cannot know whether the decree is being

circumvented without asking what the decree was meant to accomplish.  So Paragraph 109

prohibits those actions that would truly "circumvent" the decree, and no more, but does so at the

cost of binding the parties to a judge's interpretation of the agreements' aims and what it would

mean to evade them.

      Paragraph 110, by contrast, is cast as a rule.  Its language does not ask the judge to

discern and directly apply the provision's purpose, but rather provides "a list of easily

distinguishable factual aspects of a situation," *id.* at 1687, which trigger a determinate

consequence.  Volvo Powertrain urges that to read Paragraph 110 as a rule would render it

overinclusive and unbound by the purpose that it was meant to achieve—and that such a reading

might reach instances in which the substantive requirements of the decree were not

circumvented.  Even if this is so—and the government disputes the notion, arguing that it

bargained for that added emission reduction—a certain disjunction between purpose and effect is the inevitable cost of employing a rule. The benefit of a rule—the benefit for which the parties bargained in this instance—is the ease and certainty of application. To substitute the Court's own judgment for theirs would deprive the parties of that benefit. Paragraph 110 functions as a non-circumvention provision even if it reaches cases in which no circumvention has been proven.

### iii.     The stipulated penalty provisions do not render Paragraph 110 ambiguous.

Volvo Powertrain goes on to argue that the phrasing of the stipulated penalty provisions supports its reading of Paragraph 110. Indeed, the stipulated penalty provisions, which on their face apply whenever Volvo Powertrain—but not any other corporation—"seeks certificates of conformity for any affected [heavy-duty diesel engine], but cannot certify compliance with" the requirements of the consent decree, Consent Decree ¶ 116, do fit imperfectly with the language and purpose of Paragraph 110. As discussed at greater length below, this imperfect fit is at least partly due to inartful drafting: the penalty provisions contain several grammatical and structural ambiguities that render them difficult to apply directly to clearly foreseeable violations of the consent decree. To name only the most obvious examples, the language cited above would appear not to apply to violations that occurred when Volvo Construction Equipment sought certificates of conformity, nor when any company sought certificates of conformity for non-road engines, nor when a company that had purchased Volvo Powertrain facilities (and therefore, the parties agree, had become bound by the decree) sought such certificates.

The proper interpretation of the stipulated penalty provisions involves difficulties that will be taken up in short order. But those difficulties, which are numerous, internal to the

penalty provisions themselves, and largely independent of Paragraph 110, cast no doubt on the plain meaning of that non-circumvention provision.

> ### iv.   To interpret Paragraph 110 by its plain language would not render the intervention of Volvo Construction Equipment superfluous.

Finally, Volvo Powertrain argues that if Paragraph 110 meant what the government now urges, the intervention of Volvo Construction Equipment would have been superfluous.  The Court considers this argument because it invokes "the circumstances surrounding the formation of the" consent decree.  *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238 (1975). The Court, however, rejects it: although the engines that Volvo Construction Equipment manufactured at Volvo Powertrain facilities would have been covered under the plain language of Paragraph 110 whether or not Volvo Construction Equipment had intervened, that intervention brought Volvo Construction Equipment engines manufactured at other facilities within the terms of Paragraph 60.  The governments' construction therefore would not render the intervention superfluous.

This case is not *International Multifoods*.  Nor is it *Segar v. Mukasey*, 508 F.3d 16 (D.C. Cir. 2007), which stands for the proposition that a general disclaimer cannot be read to vitiate the specifically negotiated terms of an agreement.  The consent decree unambiguously reaches all non-road engines produced at Volvo Powertrain facilities, and subjects them to the substantive requirements set out in Paragraph 60.  The Court therefore proceeds to determine what constitutes a non-road engine under the consent decree.

> ### B.   Because any engine labeled for use as a non-road engine is one for the purposes of the consent decree, all of the engines in question violated the decree.

To know how many non-road engines Volvo Powertrain has produced in violation of the consent decree, the Court must determine how a non-road engine is properly defined.  Under the consent decree, "'Nonroad CI Engine' means a compression-ignition engine subject to the regulations in 40 C.F.R. Part 89."  Consent Decree ¶ 3.  Under those regulations,

> Nonroad engine means
>
> (1) Except as discussed in paragraph (2) of this definition, a nonroad engine is any internal combustion engine:
>
> . . .
>
> (iii) that, by itself or in or on a piece of equipment, is portable or transportable, meaning designed to be and capable of being carried or moved from one location to another. Indicia of transportability include, but are not limited to, wheels, skids, carrying handles, dolly, trailer, or platform.
>
> (2) An internal combustion engine is not a nonroad engine if:
>
>  . . .
>
> (iii) the engine otherwise included in paragraph (1)(iii) of this definition remains or will remain at a location for more than 12 consecutive months or a shorter period of time for an engine located at a seasonal source. . . .
>
> 40 C.F.R. § 89.2

All non-road engines must be labeled as such at the time of manufacture.  40 C.F.R. § 89.110(a) ("The manufacturer must affix at the time of manufacture a permanent and legible label identifying each nonroad engine.").

The regulatory definition of non-road engine focuses on the design—and, more problematically, on the use—of a particular engine.  *See* 59 Fed. Reg. 31306, 31311 (June 17, 1994) (noting that the regulation "distinguishes between nonroad engines and stationary internal combustion engines on the basis of engine mobility and residence time . . . . thus ensuring that engines that are actually used in a stationary manner are considered stationary engines").  So the

14

same engine may be non-road or stationary depending on whether it is moved from one site to another or instead stays put.  Of course, there is no way for a manufacturer to know when it builds an engine whether or not that engine will be frequently moved when it is put to use.  The government therefore argues that, for the purposes of the consent decree, any engine certified and labeled for use as a non-road engine is a non-road engine.  Volvo Powertrain contends that only those engines that fall within the Part 89 definition—that is, those engines that do not "remain[] . . . at a location for more than 12 consecutive months or a shorter period of time for an engine located at a seasonal source," 40 C.F.R. § 89.2, notwithstanding their labeling—can be considered non-road engines.

The government's interpretation is correct because it alone produces a workable enforcement scheme.  An interpretation "which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable," RESTATEMENT (SECOND) OF CONTRACTS § 203(a) (1981), and Volvo Powertrain's interpretation of what constitutes a non-road engine would render the consent decree unreasonably difficult to enforce.  On the company's reading, the United States would have to collect (or, perhaps, force Powertrain to collect) information on the use to which each individual engine was put.  Even if Powertrain certified an engine to conform with the non-road emissions standards and labeled it for importation as a non-road engine in conformity with 40 C.F.R. § 89.110(a), it would not become a non-road engine for purposes of the consent decree until it was actually used in the manner described above.  There is no reason to think that either the government or Powertrain could accomplish this data collection, as the affidavits attempting to demonstrate that certain

15

engines have been put to stationary uses show.  It is therefore reasonable to interpret the agreement as applying to engines that are certified and labeled for use as non-road engines.[3]

Powertrain's fallback argument, that the consent decree applies only to non-road engines that are introduced into domestic commerce, fares no better.  "As the settlement of a litigation, the decree may require less than the statute under which the suit was brought, or more . . . ." *United States v. Microsoft Corp.*, 147 F.3d 935, 944 (D.C. Cir. 1998).  Regardless of whether the EPA could have regulated engines produced for sale abroad, the requirements of Paragraph 110 plainly apply to all non-road engines "for which a Certificate of Conformity is sought."  That provision does not require actual importation, nor does any other provision of the decree.  Paragraphs 60 through 62, which make reference to the "requirements that would apply . . . if the engines were Model Year 2006 engines," Consent Decree ¶ 60, to the "requirements of 40 C.F.R. Part 89 and of the [Clear Air] Act," *id.* ¶ 61, and to the EPA's "authority under its regulations found at 40 C.F.R. Part 89 or under the Act," *id.* ¶ 62, refer to the substantive requirements and substantive authority described in those provisions.  They do not limit the agreement's clear application to non-road engines manufactured at Powertrain facilities and "for which a Certificate of Conformity is sought."  *Id.* ¶ 110.

-----------------------

[3] The largest trouble with the government's account is comparatively minor.  Because Volvo Penta submitted these engine families for certification, and thereby brought them within the scope of the consent decree, it could have imposed liability upon Volvo Powertrain without that company's knowledge or consent.  Powertrain might have built the engines expecting that they would be used as stationary engines.  But Powertrain could have solved that problem through contract, informing Penta ahead of time that Powertrain would have to build mobile engines to the standards of the consent decree and extracting a promise from Penta to pay any penalties associated with engines that Penta later certified for non-road use.

The parties agree that 8,534 Model Year 2005 engines were produced at a Powertrain factory and labeled for importation as non-road engines.  They agree that those engines did not comply with the Model Year 2006 emissions standards.  Those 8,534 engines were therefore manufactured and submitted for certification in violation of the consent decree.  The Court proceeds to consider the consequences of that violation.

**C.  Because the stipulated penalties do not apply to this violation, the Court must exercise its equitable discretion to determine a penalty**.

The third question in the case is what penalties should apply to the violation at issue here. In answering that question, the Court begins from the proposition that a district court has the inherent "authority to exercise its discretion as a court of equity in fashioning a remedy to . . . enforce a consent decree."  *Cobell v. Norton*, 391 F.3d 251, 257 (D.C. Cir. 2004); *Holland v. N.J. Dept' of Corrections*, 246 F.3d 267, 270 (3d Cir. 2001) ("[A] court does have inherent power to enforce a consent decree in response to a party's non-compliance. . . .").  "[A] consent decree is an order of the court and thus, by its very nature, vests the court with equitable discretion to enforce the obligations imposed on the parties."  *United States v. Local 359, United Seafood Workers*, 55 F.3d 64, 69 (2d Cir. 1995); *see also Bergmann v. Michigan State Transportation Commission*, 665 F.3d 681, 683 (6th Cir. 2011); *Cook v. City of Chicago*, 192 F.3d 693, 695 (7th Cir. 1999) (Posner, J.) ("From the standpoint of interpretation a consent decree is a contract, but from the standpoint of remedy it is an equitable decree."); *Berger v. Heckler*, 771 F.2d 1556, 1566–67 (2d Cir. 1985) ("Consent decrees are a hybrid in the sense that they are at once both contracts and orders; they are construed largely as contracts, but are enforced as orders.") (citation omitted).  "Until parties to such an instrument have fulfilled their

express obligations, the court has continuing authority and discretion—pursuant to its independent, juridical interests—to ensure compliance." *EEOC v. Local 580, International Association of Bridge, Structural & Ornamental Ironworkers*, 925 F.2d 588, 593 (2d Cir. 1991).

Of course, "parties to a consent decree [may] cabin the district court's equitable discretion by stipulating the remedies for breach." *Cook*, 192 F.3d at 698. The parties to this decree have stipulated that Volvo Truck Corporation, which has been succeeded by Volvo Powertrain, "shall pay stipulated penalties and other payments to the United States" if it "seeks certificates of conformity for any affected [heavy-duty diesel engines], but cannot certify compliance with . . . the [non-road] pull-ahead requirements. . . ." Consent Decree ¶ 116. Volvo Powertrain argues that this provision does not constrain the Court's discretion, because Volvo Penta rather than Volvo Powertrain sought certificates of conformity for these engines. The United States responds that such a reading would eviscerate the stipulated penalty provision, since it would imply that the penalties similarly did not apply when Volvo Construction Equipment—which, unlike Penta, is a party to the decree—sought certificates of conformity.

There is a genuine difficulty here, which begins with the fact that the provision is poorly drafted. Read literally, it applies whenever Volvo Powertrain cannot certify that heavy-duty diesel engines comply with the non-road pull-ahead. But that literal reading is nonsense: the non-road pull-ahead does not apply to heavy-duty diesel engines, which are by definition on-road engines. *See* 40 C.F.R. § 86.082-2 ("Heavy-duty engine means any engine which the engine manufacturer could reasonably expect to be used for motive power *in a heavy-duty vehicle*.") (incorporated into the Consent Decree at ¶ 3). As discussed above, the provision has other problems, too: it does not prescribe a penalty for violations committed by Volvo

18

Construction Equipment, nor by any manufacturers that may purchase Powertrain factories, nor by Powertrain itself when the engines are submitted for certification by another company.

If this were an ordinary contract, the Court would conclude that the provision was ambiguous because its plain language indicated one reading while its context indicated another. In such a case, the Court would proceed to examine extrinsic evidence of the parties' intent. But the Court is mindful that where a "[consent] decree does not specify the consequences of a breach" that question is "[i]mplicitly . . . referred to the district court's equitable discretion." *Cook*, 192 F.3d at 698. "[T]hough a court cannot randomly expand or contract the terms agreed upon in a consent decree, judicial discretion in flexing its supervisory and enforcement muscles is broad." *EEOC v. Local 580, International Association of Bridge, Structural & Ornamental Ironworkers*, 925 F.2d 588, 593 (2d Cir. 1991). If the parties wish to limit that broad discretion, they must do so clearly—and gain the Court's approval for their proposal. *See Cook*, 192 F.3d at 698 (citing *Blankenship & Assocs. v. NLRB*, 54 F.3d 447, 449–50 (7th Cir. 1995)). In the absence of an unambiguous constraint on its inherent power to enforce its own decrees, the Court will proceed to fashion an equitable remedy for the violation that it has found.

The Court has few markers to guide it in the exercise of its equitable authority, and so it places particular emphasis on the consent decree's instruction that, in reviewing any dispute, "the Court . . . should consider the effect of the resolution on other Settling HDDE Manufacturers." Consent Decree ¶ 129. Those manufacturers were subject to identical stipulated penalty provisions, *see, e.g.*, Consent Decree at ¶ 116, *United States v. Mack Trucks, Inc., et al.*, Civil Action No. 98-2543 (D.D.C. July 1, 1999); Consent Decree at ¶ 116, *United States v. Cummins Engine Co, Inc.*, Civil Action No. 98-2546 (D.D.C. July 1, 1999), and one has

paid $193 million in non-conformance penalties.  Pl.'s Opp. to Def.'s Mot. for Judicial Review,

Ex. S (Declaration of Anne K. Wick (Apr. 30, 2009)) ("Wick Decl."), at ¶ 9 (describing penalties

paid by Caterpillar, Inc., the defendant in Civil Action No. 98-2544).  Although this penalty is

substantial, when it submitted the decrees for approval the government explained that "[t]he

nonconformance payments are valued at more than the estimated cost of compliance . . . to take

away any economic incentive not to meet the more stringent emission levels."  Pl.'s Mot. to

Enter Consent Decree at 31.  To allow Volvo Powertrain to pay a lesser penalty here might place

it at a competitive advantage relative to the settling manufacturers who either complied with the

emissions standards in their consent decrees or else paid the stipulated penalties.

     The stipulated penalty provision does not bind the Court in its exercise of equitable

discretion, but that provision does offer guidance.  The Court therefore notes that Volvo

Powertrain does not dispute that the stipulated penalties, if they applied to this violation, would

require it to make a payment of $65,759,212, but does contest the government's demand for

$6,247,125 in interest accruing from the time that the violations occurred until the government

issued its demand letter.  The government responds that such an interest payment is appropriate

because the penalties accrued on the date of non-compliance, Pl.'s Opp. at 51 (citing Consent

Decree ¶ 119), and at least one other manufacturer paid interest on delayed payments in a similar

circumstance.  *Id.* at 52 (citing Wick Decl. at ¶ 6).

     The requirements at issue here bound all of the engine manufacturers subject to these

decrees.  Manufacturers that violated their decrees have been penalized in accordance with the

stipulated penalty provisions.  Although those provisions are drafted so poorly that they do not

clearly apply to this violation, the Court finds that they provide useful guidance and exercises its

equitable authority to order Volvo Powertrain to forfeit to the government $72,006,337, an amount equal to the penalty that would have been assessed under the stipulated provision plus interest accrued from the date of the violation.

## IV.  THE SETTLEMENT AGREEMENT

The Court now turns to a settlement agreement between Volvo Powertrain and the California Air Resources Board, which was signed to resolve accusations that the same alleged "defeat devices" violated state law.  The Air Resources Board intervened in this case to claim that Volvo Powertrain had violated that settlement agreement, which contains provisions essentially identical to Paragraphs 60 and 110 of the consent decree.  *See* Def.'s Mot. for Judicial Review, Ex. A (Settlement Agreement Between the California Air Resources Board and Volvo Truck Corporation (Oct. 21, 1998)) ("Settlement Agreement"), at ¶¶ 60, 110.

The Court has supplemental jurisdiction over this dispute under 28 U.S.C. § 1367(a) because the claim of the Air Resources Board is so related to the United States' claim that it forms part of the same Article III case or controversy.   A settlement agreement is essentially a contract, *Makins v. District of Columbia*, 277 F.3d 544, 546 (D.C. Cir. 2002), and a contract dispute is a state law claim.  *Bender v. Jordan*, 623 F.3d 1128, 1130 (D.C. Cir. 2010).  "A federal claim and a state law claim form part of the same Article III case or controversy if the two claims 'derive from a common nucleus of operative fact' such that 'the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case."'" *Lindsay v. Gov't Emps. Ins. Co.*, 448 F.3d 416, 423–24 (D.C. Cir. 2006) (quoting *Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164–65 (1997) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966))) (alteration in *Int'l*

*Coll.*).  This is so even if the state law claim "involve[s] the joinder or intervention of additional

parties."  28 U.S.C. § 1367(a).  Here, the two disputes involve the production of the same

engines and the interpretation of essentially the same contractual language.  Moreover, the

recovery provisions of the Consent Decree and Settlement Agreement are intertwined: each

provides for stipulated penalties, but provides that Volvo Powertrain shall only be liable to pay

those penalties once, whether they are "paid to the United States, [the Air Resources Board], or

both."  Consent Decree ¶ 118; Settlement Agreement ¶ 118.  Given the close connection between

the claim advanced by the Air Resources Board and that put forward by the United States, the

Court concludes that the claims derive from a common nucleus of operative fact, and goes on to

consider the merits of the Air Resources Board's claim.

The Air Resources Board argues that Volvo Powertrain violated the Settlement

Agreement for the same reasons and in the same way that it violated the Consent Decree.  The

Board's argument is persuasive, and the analysis of the Consent Decree set out at III.A and III.B

above is entirely applicable to the Settlement Agreement.  Briefly, Paragraphs 60 and 110 of the

Settlement Agreement are indistinguishable from the Paragraphs 60 and 110 of the Consent

Decree.  The engines in question here were "manufactured at [a] facility owned or operated by

[Volvo Powertrain] on or after January 1, 1998," and "an Executive Order [the California

equivalent of a federal Certificate of Conformity] [was] sought" for them.  Settlement Agreement

¶ 110.  The engines were therefore required to " meet all applicable requirements of [the]

Settlement Agreement, regardless of whether [Volvo Powertrain] still owned, owns, operated, or

operates that facility at the time the engine[s] [were] manufactured."  *Id.*  Those "applicable

requirements" are set out in Paragraph 60, which requires that "Nonroad CI Engines"

manufactured on or after January 1, 2005 meet the standards "that would apply if the engines were Model Year 2006 engines." *Id.* ¶ 60.  A "Nonroad CI Engine" is, for purposes of the Settlement Agreement, an "off-road compression-ignition engine" within the meaning of the California Code of Regulations, Title 13, § 2421(a)(38).  *See* Pl.'s Mot at 41 n.12.   This definition employs the same language found in 40 C.F.R. § 89.2 and discussed above, *compare* Cal. Code Regs. tit. 13,  § 2421(a)(38)(A)(3), (B)(3) *with* 40 C.F.R. § 89.2, which focuses on the use to which engines are put.  An apparently mobile (and therefore apparently covered) engine is excluded from the definition if it "remains or will remain at a location for more than 12 consecutive months or a shorter time for an engine located at a seasonal source."  Cal. Code Regs. tit. 13,  § 2421(a)(38)(B)(3).  A settlement agreement, like a consent decree, must be read to give its terms a reasonable and effective meaning, and the Air Resources Board is no more capable than the United States of collecting information on the use to which each individual engine is put.  An engine is therefore a Nonroad CI Engine for purposes of the Settlement Agreement if it is labeled for use as such.  All 8,534 engines at issue here were so labeled, and all were therefore required to meet the standards applicable to Model Year 2006 engines.  None did.  Volvo Powertrain has therefore breached the Settlement Agreement, and the Court turns to analyze the Agreement's stipulated penalty provision.

Like the Consent Decree, the Settlement Agreement provides that Volvo Powertrain, as successor to Volvo Truck, "shall pay stipulated penalties," Settlement Agreement ¶ 116, if it "seeks Executive Orders for any affected [heavy-duty diesel engines], but cannot certify compliance with . . . the Nonroad CI Engine standard pull-ahead requirements," *id.* ¶ 116(a).  Again, an interpretive problem arises from the difficulty of this language and the fact that Volvo

Penta rather than Volvo Powertrain sought the Executive Orders.  But the easy analogy to the

Consent Decree ends here, because the Settlement Agreement is not an order of the court.  The

Court has no "independent, juridical interests" in seeing the Settlement Agreement enforced,

*Local 580*, 925 F.2d at 593, nor any "equitable discretion to enforce the obligations imposed on

the parties" by that agreement.  *Local 359*, 55 F.3d at 69.  The Court can only enforce the

bargain that the parties have struck.  The Court must therefore conclude that the stipulated

penalty provision is ambiguous, because its plain language indicates that it is limited to engines

for which Volvo Powertrain sought Executive Orders, while its context suggests that it should at

least apply to violations committed by Volvo Construction Equipment or by any manufacturers

that may purchase Powertrain factories—and therefore that it cannot be limited to the scope of

the plain text.  To resolve this ambiguity, the Court must examine the circumstances surrounding

the formation of the Settlement Agreement, but the present motions and their attached exhibits

do not offer the Court a sufficient evidentiary basis from which to conduct that examination.

## V.  CONCLUSION

For the reasons stated above, Volvo Powertrain's motion for judicial review will be

**DENIED** this 13th day of April 2012 insofar as it asks the Court to find that it has not violated

the consent decree.  The Court will exercise its equitable authority and enter a separate judgment

of $72,006,337 against Volvo Powertrain and in favor of the United States.

Volvo Powertrain's motion for judicial review is further **DENIED** insofar as it asks the

Court to find that it has not violated its settlement agreement with the Air Resources Board.  But

because the scope of that agreement's stipulated penalty provision is ambiguous, the Court will

consider parol evidence as to the parties' intent.  The parties will be directed to meet and confer

and submit within twenty days a proposed order to schedule further proceedings.


Royce C. Lamberth
Chief Judge
United States District Court
    for the District of Columbia